191 So. 884

### NATIONAL LIFE & ACCIDENT INS. CO. v. McGHEE.

### 6 Div. 525.

Supreme Court of Alabama.

Oct. 12, 1939.

Rehearing Denied Nov. 9, 1939.

McEniry & McEniry, of Bessemer, for appellant.

Ross, Bumgardner, Ross & Ross, of Bessemer, for appellee.

474

THOMAS, Justice.

The suit was in two counts based on separate insurance contracts. Count 1 declared upon an alleged renewal of accident contract of insurance on application of insured for loss alleged to be due directly and independently of all causes from a bodily injury which was sustained while, it is alleged, said policy was in force, and which was affected accidently and through external and violent means, which resulted in death within ninety days from the date of said accident.

Count 2 was upon a contract based on an application for life insurance with benefits amounting to four hundred dollars in event of death and a binder receipt providing that the benefits in effect in event of death before delivery of policy should be paid *after application had been approved in the home office.*

The verdict was for plaintiff for amounts sued for under both counts of the complaint.

The case, under respective policies, is thus stated by appellee:

The appellant issued its accident policy to one Senior McGhee, deceased bearing date of February 22, 1937, for the sum of $175, being policy No. 16109245. There is some evidence, though disputed by the appellee, that this policy lapsed for nonpayment of premiums on September 27, 1937. On November 20, 1937, Senior McGhee paid to the appellant $2.24 and made application for revival of this policy and was given a revival receipt on the regular form of the company. "The $2.24 was arrived at as follows: 5 weekly premiums at 35 cents or $1.-75 to November 1, 1937, 20 per cent of two

succeeding 35 cent premiums or 14 cents, and the next premium in full, totaling $2.24 and paying the premiums on this policy to November 22, 1937." This amount was paid to the appellant's agent P. P. Herring and P. P. Herring gave the insured the company's official revival receipt as follows:

"Revival Receipt
"The National Life & Accident
Insurance Company, Inc.
"Home Office, Nashville, Tenn.
"$2.24                    11–20, 1937.
"Received of Senior McGhee 2 Dollars 24 cents.

"Being premium arrears on Policy No. ———— which is accepted only as 'a deposit on the following conditions which are acknowledged by the applicant by acceptance of this receipt, to-wit:

"(1) Except in case of Death, or Disablement resulting from Accident occurring between the date of this receipt and date of revival the Company assumes no liability whatever until the policy is revived on the books of the Company, this to be evidenced by endorsement on the policy.

"(2) That the statements contained in the application for revival are true.

"(3) If the revival application is not approved, the amount of this deposit shall be returned to the applicant.
                "(Signed)  P. P. Herring.

"NOTE.—If policy is not revived by the Company the amount deposited for such revival shall be returned upon surrender of this receipt."

On this same date, November 20, 1937, Mr. Herring took Senior McGhee's application for a policy of life insurance in the sum of $400 and issued the Company's receipt therefor, in consideration of the further sum of eighty cents paid to him, as follows:

"National Life & Accident Insurance Company.  Shields You.

"Received of Senior McGhee Date paid Month—11 Day—20 Year—37 Premium Received 80 Signature of Representative P. P. Herring,

"For a premium deposit on account of application for insurance to The National Life and Accident Insurance Company, made this date, the weekly premium for which is to be 40 cents per week. If the application is accepted and a policy issued, this sum will be applied to the payment of the premium thereon. If the application is rejected the amount will be returned to the applicant. No obligation is incurred by said Company by reason of this deposit, unless and until a policy is issued upon said application and delivered, and unless at the date of the delivery of said policy the person proposed to be insured is alive and in sound health, except that if the person proposed to be insured is now alive and in sound health and the amount paid by or for such person at the time the application is written is not less than the amount of two weekly premiums, and this receipt covering said payment, is surrendered to the Company, the Company agrees, if the application is approved at the Home Office in Nashville, Tennessee, that should death occur prior to the issuance and or delivery of the policy or should applicant by reason of accident be totally disabled within the meaning of the policy applied for prior to the issuance and or delivery thereof, or should the applicant by reason of accident suffer dismemberment within the meaning of the policy applied for, or by reason of accident suffer the loss of sight of both eyes prior to the issuance and or delivery thereof, it will nevertheless pay such amounts as would have been due under the policy if issued and delivered, provided, however, such death or accident, resulting in any of said disabilities, occur within twenty-one (21) days of the date and signing of this application, otherwise, this receipt and the insurance granted hereunder shall be null and void, and the premium paid will be returned. No obligation is assumed by the Company unless the application is so approved, and the person proposed for insurance is now alive and in sound health.

"Disability benefits for illness, if provided for in the policy applied for, are payable only if such disability begins or occurs after the date of delivery of the policy.
              "The National Life & Accident Insurance Company, Inc.

"Be Careful of This Receipt, It Is Valuable.

"If the holder of this receipt does not receive a Policy of Insurance or the return of the money herein receipted for, within three weeks, write, stating name of Agent and particulars, to The National Life & Accident Insurance Company, 301 Seventh Avenue, North, Nashville, Tennessee."

The evidence shows that on November 20, 1937 (Saturday), Mr. Herring took Senior McGhee's application; that on the following Wednesday Senior McGhee left his home in Jefferson County, stating that he was going to Georgia for a hunting trip over Thanksgiving and November 24, 1937, was the last day that the appellee, who is his wife, saw him alive. Thanksgiving day in 1937 was on November 25th, and, as usual, was on a Thursday. The appellee next saw her husband on November 27, 1937, and he was then dead, and when she saw him on the 27th some men were bringing him out of the creek near their home.

Mr. Herring testified that he received notice after Senior McGhee's death that the accident policy for $175 was revived. As to this the agent testified as follows:

"This is the revival receipt (indicating) that I gave him. I can't recall which one I gave that receipt to, but this is the receipt I written out there. It shows receipt of $2.24. I figured that $2.24 as five weeks in full arrears, which would be $1.75, and 20 per cent of the remaining weeks up until the date it is supposed to be revived, and then one advance week. We do not charge a 20 per cent penalty, but we gave him a 20 per cent discount on the remaining weeks; he was then five week up to date. This is that revival application that he signed (indicating); he signed it himself. There is printed on that revival application the following: 'I hereby declare that I have collected all the arrears on the above policy; that I have personally seen the party formerly insured under that policy; that he appears to be the age stated above and in good health. I therefore advise the Company to revive the policy.' I signed that statement. I also wrote on there that the premiums on the policy were paid up to November 22, 1937. The Lapse Sheet shows that Senior McGhee was delinquent on September 27th. There is no reason why this payment of $2.24 would not pay him up to November the 22nd. If I can get a calendar with the Mondays on it I can figure that out. Here is the 9th, 27th, that would be $1.75 full arrears up to November the first. I collected two weeks at seven cents, or 20 per cent of the face of the premium; that would be 14 cents; that put it up to the 14th. I collected one advance premium which is stated on the application, and that put it up to November the 22nd. When I had the revival receipt signed I

did not take up the old policy, and I wasn't supposed to. It is true that the policy contains this clause: 'Policies having lapsed may be revived at the option of the Company upon written application of the insured showing satisfactory evidence of insurability, and upon payment of all premiums in arrears; provided that the Company's consent to such revival shall appear by endorsement in the space provided, and that there shall be no liability whatever under this contract for any disability or accidental death or any specific losses mentioned in Schedule A resulting from an accident occurring or illness contracted or commencing prior to the date of the revival endorsement hereon as aforesaid.' But the company sends the endorsement, and we had it here a while ago, or sample of it; that is their official stamp, and it is put on the policy itself whenever it is revived. The Revival Endorsement is supposed to be pinned on the policy on the date it is received. Nothing has been pinned on this revival application. If there has been anything pinned on to this revival application I don't know anything about it and I couldn't tell about that. I do see two holes in it like pin holes but I don't know what has been pinned on there. I have already testified I never got any notice of revival up to the date of Senior McGhee's death. Whereupon witness was by the attorney for plaintiff asked the following question: 'Q. did you get notice it was revived after his death?' 'A. Yes, sir.' "

Appellee testified that the said Mr. Herring on Monday (November 29th) following the finding of her husband's body came to her home and told her that the policy for $400 had arrived at the home office in Bessemer and that she asked him to give her the policy and Mr. Herring told her that he would bring it to her the next day, but that he never brought it.

Senior McGhee's body, after being taken from the creek, showed that it contained no marks of violence or cuts or bruises whatever, and was in an excellent state of preservation.

Mr. McCollum, who is the Deputy Coroner at Bessemer, and who is also a licensed embalmer and undertaker, and who was present at the time the body was removed from the creek, testified in his opinian this man had been dead for probably two days. Another undertaker, A. C. Chambers, to whose place of business the

body was taken immediately upon its removal from the creek testified that in his opinion the body had been dead at least six hours and not more than 24 hours. This body was embalmed the same night it was found. The body was buried about December 1937, on the 20th day thereof. It was held out for about three weeks. And on December 6, 1937, Dr. Walter Jones performed an autopsy on the body and he stated in his opinion the principal cause of death was acute epidemic cerebral meningitis and a contributing cause of importance not related to principal cause was Chronic glomerulonephritis. However, Mr. McCollum was present during the entire autopsy and Mr. McCollum being qualified as an embalmer and undertaker testified that the body showed no evidence of poisoning and the body on the inside was as natural as any that he had ever seen and that he had seen lots of post mortems and that in his opinion the cause of Senior McGhee's death was drowning. Mr. McCollum testified that at the time the body was found water ran from the mouth and that in many cases where a person falls into water the body has no water in it at all; that in cases of this kind the person becomes strangled and really suffocates, and that in many cases a tablespoon of water in each lung would be sufficient to cause drowning; that at the first he viewed the body in the creek there was nothing holding it down and it was entirely submerged in about three feet of water and the body was lying on its stomach fully clothed, except the hat, and with the shoes laced up; there was a steep creek bank anywhere from 5 to 7 feet high at the place where the body was found, and that the body was about 3 feet from the edge of this bank.

Dr. Jones testified that the only cause of death that he could put down was acute meningitis on the report, but he testified in his oral examination that in his opinion the deceased had had meningitis for two or three weeks, based upon the autopsy, and that the meningitis was chronic, and that he did not think the deceased had been dead but about twelve hours when he did the autopsy. Dr. Jones later testified that practically everything about the body was normal, and Dr. Jones testified that the meningitis that he found in this body could not possibly have developed within less than two or three weeks.

Dr. G. J. Roscoe, a highly educated and efficient expert, testified that the length of time it would take meningitis to develop to the extent mentioned in Dr. Jones' report is largely dependent on the germ that was the cause and it could develop anywhere from a few hours to several days, and that it would be definitely more difficult to determine under the conditions in this case than if the man performing the autopsy had gotten the body within a short time after death, because certain post mortem changes take place in the body whether it is embalmed or not which are difficult to interpret.

In Dr. Roscoe's opinion the deceased, judging from the facts contained in Dr. Jones' report, had a mild form of meningitis, and that people frequently recover from meningitis.

There was a great deal of lay testimony in behalf of the appellee that the witness had never heard of Senior McGhee being sick and that from his appearance he was a well man and all right; that he had never been to bed on account of illness, and had never been under the treatment of a doctor, and was normal mentally.

As to the powers and duties of the appellant's agent P. P. Herring, as shown by appellant's answers to interrogatories, his duties were to collect premiums and solicit applications for new insurance, and to deliver policies of insurance to policy holders of the appellant. Mr. Herring testified that the following was the appellant's procedure in case of revival of an insurance policy: "When the revival application is sent in and the policy nas been approved, then we were sent a revival slip from the home office, and that has to be given to the policy holder, and the receipt taken up, and the amount collected on the receipt posted on the book."

As to the revival application in question, Mr. Herring testified: "When I had the revival receipt signed I did not take up the old policy, and I wasn't supposed to." Further testifying, the witness said: "But the company sends the endorsement, and we had it here awhile ago, or sample of it; that is their official stamp, and it is put on the policy itself whenever it is revived. The revival endorsement is supposed to be pinned on the policy on the date it is received."

478

■ The time and cause of assured's death, whether by accidental drowning [1 Corpus Juris, pp. 427-432] or by the result of disease, are material questions of fact to be determined by the jury. Metropolitan Life Ins. Co. v. Halsey, 230 Ala. 193, 160 So. 248; Metropolitan Life Ins. Co. v. James, 225 Ala. 561, 144 So. 33; Benefit Association of Railway Employees v. Armbruster, 224 Ala. 302, 140 So. 356.

■ Many authorities are collected in 1 Corpus Juris, p. 470. Note 93. The text and note read as follows: "In this connection the phrase 'proximate cause' means that cause which directly produces the effect, as distinguished from the remote cause, the cause which sets in motion a train of events which brings about a result without the intervention of any force operating and working actively from a new and independent source; but this does not necessarily mean the cause or condition nearest in time or place to the result. Although each case must rest upon its own facts, * * *."

Note 93 [c] reads as follows:

"*Where death resulted from the aggravation of a disease* by accidental injury the insurer was held liable, although the policy limited liability to accidental injuries resulting directly, independently, and exclusively of all other causes in death. Fidelity & Casualty Co. v. Meyer, [106 Ark. 91], 152 S.W. 995, [44 L.R.A.,N.S. 493].

"[d] *Where insured was drowned owing to his being attacked by a fit* the insurers were held liable. Lawrence v. Accidental Ins. Co., 7 Q.B.D. 216; Winspear v. Accidental Ins. Co., 6 Q.B.D 42. Compare Reynolds v. Accidental Ins. Co., 22 L. T.Rep.N.S. 820."

In Metropolitan Life Ins. Co. v. Halsey, 230 Ala. 193, 160 So. 248, 249, it was declared: "The weight and credibility of expert testimony, and when affirmative instruction requested should be given or refused, were the subjects of the recent decisions by this court—testimony, when given by an expert, being held undisputed, directly or indirectly, and based upon scientific processes, methods, and knowledge *when there is no reason for the exercise of* common knowledge against it—and the affirmative charge on the question involved, with hypothesis on belief of evidence, held should be given on due request. McMul-

len et al. v. Daniel [229 Ala. 194], 155 So. 687; Commonwealth Life Ins. Co. v. Harmon, 228 Ala. 377, 153 So. 755, and authorities; Harris v. Nashville Co. & St. Louis R. Co., 153 Ala. 139, 143, 44 So. 962, 14 L.R.A. (N.S.) 261; Lawson v. Mobile Electric Co., 204 Ala. 318, 85 So. 257; Louisville & Nashville Railroad Co. v. Marbury Lumber Co., 125 Ala. 237, 28 So. 438, 50 L.R.A. 620; Alabama Great Southern R. R. Co. v. Hill, 93 Ala. 514, 523, 9 So. 722, 30 Am.St.Rep. 65; Atlantic Coast Line R. Co. v. Jackson, 225 Ala. 652, 144 So. 813; Metropolitan Life Ins. Co. v. Chambers, 226 Ala. 192, 146 So. 524."

See also Frazer v. First National Bank of Mobile, 235 Ala. 252, 178 So. 441.

■ There was testimony pro and con as to the proximate date and cause of the death of insured. No reversible error intervened in the instruction of the court to the jury on this phase of the case. The presumption is against suicide. Mutual Life Ins. Co. of N. Y. v. Maddox, 221 Ala. 292, 128 So. 383.

■ The evidence tending to show no external violence as affecting insured and his recovered body constitutes prima facie proof that his injury, under the facts presented by the record, was accidental and within the terms of the policy declared in Count 1, under the presumption of law that injuries were not intentionally inflicted by insured. Inter-Ocean Casualty Co. v. Foster, 226 Ala. 348, 147 So. 127. That is to say, we have indicated that under the several tendencies of evidence, it was a question for determination by the jury whether death of insured (whose body was found in the river) resulted from drowning or accident or violent means. Metropolitan Life Ins. Company v. James, supra.

■ In other words, in an action on an accident insurance policy, where the evidence is conflicting as to whether the accident was the sole proximate cause of the injury in question or the result of natural causes, or reasonable tendency of such conflicting evidence, makes a jury question. Such is the result notwithstanding the opinion of experts given in evidence that did not exclude the reasonable field of common knowledge and experience as to the result. A jury question is presented. Metropolitan Life Insurance Co. v. Halsey, 230 Ala. 193, 160 So. 248.

In Standard Accident Insurance Co. of Detroit, Michigan, v. Hoehn, 215 Ala. 109, 110 So. 7, Mr. Justice Sayre for this court declared:

"Accident policy, ambiguous in its coverage of case where accident and disease contributed to death, will be construed favorably to insured.

"In action on accident policy with defense that death of insured resulted from disease and accident for which insurer was not liable, question of insurer's liability held for jury."

We have indicated that there was no error in refusing the affirmative instructions requested by defendant.

■ It is established that conditions inserted in a policy for insurer's benefit may be waived by an agent having authority to the end of such waiver. New York Life Ins. Co. v. McJunkin, 227 Ala. 228, 149 So. 663.

Dr. Jones, who did the autopsy within twelve hours after insured's death, testified as an expert that the victim's organs were normal and that, in his opinion, death had ensued about twelve hours previously. The other evidence showed the man had been missing about ten days before discovery of the body. The testimony of the undertakers and embalmer was in conflict with the evidence of Dr. Jones and that death had ensued by drowning. Dr. Roscoe did not agree with Dr. Jones as to whether changes or pathological disease existed before or arose after death, and stated that it could not be determined from such an examination after death whether insured died of meningitis. Under such conflicting tendencies of evidence, the cause of insured's death was for the jury. Metropolitan Life Ins. Co. v. Chambers, 226 Ala. 192, 146 So. 524:

The appellant contends that the following provisions of the policy bar a recovery: "Policy having lapsed may be revived at option of the Company upon written application of the insured showing satisfactory evidence of insurability and upon payment of all premiums in arrears; provided that the company's consent to such revival shall appear by endorsement in the space provided, and that there shall be no liability whatever under this contract for any disability or accidental death or any specific losses mentioned in Schedule A resulting from an accident occurring or illness contracted or commenced prior to the time of the revival endorsement hereon, as aforesaid."

■ This provision standing alone would probably be conclusive of the appellant's liability on the accident policy but not so when construed in connection with the revival receipt, as the revival receipt states that the appellant assumes responsibility for death or disability occurring between the *date of the revival receipt and the date of revival of the policy.* The rights of the parties to change the terms of the original policy by the revival receipt is established by the decision National Life & Accident Ins. Co. v. Lokey, 166 Ala. 174, 52 So. 45. In that case the rule was applied that confusing provisions will be construed in favor of insured. The provisions of the revival receipt will prevail and the appellant is liable under the accident policy, despite the fact that the approval of the application for revival was not endorsed on the policy, as all that remained to complete the endorsement was delivery of approved revival application to the beneficiary, if this was prevented by the appellant refusing to so deliver after death of insured.

Appellant contends that the testimony of the appellee to the effect that Mr. Herring, appellant's agent, told her that the policy was at the office and he would bring it to her 'the next day was inadmissible because it was not a part of the res gestae of delivery vel non of the policy.

■ The appellant admits in its answers to interrogatories that if a policy issued the application was approved. The uniform general rule of law governing this feature of the case is to the effect that an admission of an agent may be received in evidence against his principal where the agent, in making the admission, was acting within the scope of his authority and the transaction or negotiation to which the admission relates was pending at the time when it was made, and the admission must have been made in connection with the discharge of the agent's duties and based on the agent's knowledge and be a statement of fact. 22 Corpus Juris, p. 367, § 440 et seq., and authorities cited under this proposition.

■ Mr. Herring was acting within the scope of his authority at the time this admission was made, as his authority was to solicit applications for new insurance, take applications for revival of lapsed policies,

collect premiums from policy holders and deliver policies of insurance to applicants. It was within his authority to deliver policies and therefore he was acting within the scope of his authority at the time he made the admission concerning the delivery of a new policy.

See decisions in Western Union Telegraph Co. v. Benson, 159 Ala. 254, 258, 48 So. 712; Louisville & N. R. Co. v. Crick, 217 Ala. 547, 117 So. 167; Mid-Continent Life Ins. Co. v. Beasley, 202 Ala. 35, 79 So. 373; Wade v. Brisker, 233 Ala. 585, 173 So. 64; Insurance Co. of North America v. Thornton et al., 130 Ala. 222, 30 So. 614, 55 L.R.A. 547, 89 Am.St.Rep. 30. No error was committed in the admission of Mr. Herring's declarations in the pending matter within the line of his duty.

The court charged the jury: "By a failure upon its part to act with due diligence and dispatch in that respect (decline to do so or reinstate) the policy may become revived impliedly as a matter of law." [Parenthesis supplied.]

May an undue delay on the part of defendant company in acting upon a revival application, or failure to communicate refusal amount to a waiver of formal requirements or operate as a revival of the lapsed policy? We think the foregoing instruction was in error. Lewis v. Brotherhood of Locomotive Firemen and Enginemen, 220 Ala. 270, 124 So. 889; Alabama Gold Life Ins. Co. v. Mayes, 61 Ala. 163. Was this reversible error?

It has been declared by this court that mere delay or inaction on the part of defendant may amount to an acceptance of a proposal to enter into a contract. Such was the nature of the reinstatement of the lapsed contract of insurance insisted upon by appellee.

In Alabama Gold Life Ins. Co. v. Mayes, 61 Ala. 163, 166, it was declared: "Whether by parol, or in writing, as in all other contracts, the mutual assent of the parties to all the elements and terms of the contract, is essential to its existence. If the parties have not agreed on the subject of insurance, the limit and duration of the risk, the perils insured against, or the hazards insured, the rate of premium, and the amount to be paid in the event of a loss, or upon any other element or term which may be peculiar to the particular contract, whatever may have been the negotiations or propositions passing between them, these have not reached the form and obligation of an existing contract."

The revival receipt, when acted upon by the company, was itself a contract not dependent upon delivery to the policy-holder. The instruction of the court hereinabove set out was not reversible error as to Count 1 declared on.

What of the evidence as to approval of the application for additional insurance and delivery of the life policy for $400 made the subject of Count 2 of the complaint and the effect of request by defendant for the general affirmative charge as to such count?

■ The general rule is that life policies are effective on completion of the contract, whether such completion is by approval of application or delivery of policy while the assured is in life or sound health. National Life & Accident Ins. Co. v. Bridgeforth, 220 Ala. 314, 124 So. 886; New York Life Ins. Co. v. McJunkin, 227 Ala. 228, 149 So. 663; American National Ins. Co. v. Few, 224 Ala. 576, 141 So. 234; Metropolitan Life Ins. Co. v. James, 228 Ala. 383, 389, 390, 153 So. 759.

As we understand this record and evidence as to the life policy and approval of its application and delivery while assured was in life and in sound health, there are conflicting tendencies of evidence to be considered. We have indicated that with the application and payment of premium assured was given a binding receipt independent of approval, etc. Thus the fact of approval before death was a determining factor. On this question the beneficiary testified that the agent said the policy was in his office on November 29th, having been sent to that office by the home office. If such was the fact, approval of the application by the home office was an inference to be drawn by the jury.

The evidence of Herring and Miss Griffin is to the contrary effect. If the application was not approved before assured's death, there was nothing to give effect to the binding receipt as a contract of insurance. Under this conflict in evidence, the question of approval of the application before assured's death was a material fact for determination of the jury. McMillan v. Aiken, 205 Ala. 35, 88 So. 135.

■ Looking to the refused charge on which a reversal is sought to be had as to this count, it will be noted that refused charge fourteen is predicated on delivery

vel non of the policy issued, stating the name of the plaintiff as beneficiary and charge twenty-seven is predicated on the issue and delivery of policy to said Senior McGhee. These charges ignore the terms and legal effect of the binding receipt given when the application was made. Such binding receipt recites the application for insurance, payment of the premium and states that if the application is accepted "and a policy issued" this sum will be applied to payment of premium thereon; that if the application is rejected the amount will be "returned to the applicant." Such binder further states that "No obligation is incurred by said Company by reason of this deposit, unless and until a policy is issued upon said application and delivered, and unless at the date of the delivery of said policy the person proposed to be insured is alive and in sound health." Such binding receipt states further that *"should death occur prior to the issuance and or delivery of the policy* or should applicant *by reason of accident* be totally disabled within the meaning of the policy applied for prior to the issuance and or delivery thereof," etc., the company will nevertheless *"pay such amounts* as would have been *due under* the *policy if issued and delivered,"* and that "No obligation is assumed by the Company unless the application is so approved, and the person proposed for insurance is now alive and in sound health." Thus the binding receipt is predicated upon approval of the application and that the person proposed for insurance is at the time of the application and the giving of the binding receipt "alive and in sound health." [Italics supplied.]

The conflicts in the evidence as to the fact of insured being in sound health and whether or not the application for insurance was approved, and whether the applicant was alive at the time approval was made were questions for the jury.

Under the provisions of the binding receipt, given when application was made and accepted, the conflict in testimony pro and con as to when and how assured came to his death, when and whether or no the application for insurance was approved by the home office and whether or not applicant was in life and in sound health when the application was made and approval thereof given by the home office, there was no error to reversal in refusing defendant's several requested charges and

not giving the affirmative instruction on such issues.

The judgment of the circuit court is affirmed.

Affirmed.

ANDERSON, C. J., and BROWN and FOSTER, JJ., concur.

### On Rehearing.

THOMAS, Justice.

We have again examined the instruction of the court to the effect that by a failure of the insurer to act with due diligence and dispatch in that respect, "the policy may become revived impliedly as a matter of law."

The contract provision was: "* * * Policies having lapsed may be revived at the option of the Company upon written application of the Insured showing satisfactory evidence of insurability, and upon payment of all premiums in arrears; provided that the Company's consent to such revival shall appear by endorsement in the space provided, and that there shall be no liability whatever under this contract for any disability or accidental death or any specific losses mentioned in Schedule A resulting from an accident occurring or illness contracted or commencing prior to the date of the revival endorsement hereon as aforesaid."

In Vol. 6 of Couch's Cyclopedia of Insurance Law, § 1375, p. 4940, it is declared on authorities from this state, as follows: "* * * the acceptance of premiums after default, amounting to a waiver of the default, does not create a new contract, but merely continues the binding effect of the original policy. (Pacific M. L. Ins. Co. v. Hayes, 202 Ala. 450, 80 So. 834.) However, the insured may waive his right to reinstatement, which would arise from compliance with the conditions in the policy, and contract for a new policy with different conditions. (Mutual L. Ins. Co. v. Lovejoy, 203 Ala. 452, 83 So. 591.) Similarly, stipulations as to mode of revival and the limitations upon its effect are for the protection of the insurer, and may be waived, either expressly or by implication. (Life & Casualty Co. v. Street, 213 Ala. 588, 105 So. 672, holding that, where the contract does not require execution of a revival by an executive officer at the home office, a local agent has power so to act as to bind the company.) For instance, undue delay in acting upon an application for re-

482

vival, or failure to communicate to the insured the fact of the rejection of his application, may amount to a waiver of formal requirements and operate as an effective revival. (Life & Casualty Co. v. Street, 213 Ala. 588, 105 So. 672.)" (Parenthesis supplied from notes.)

In Life & Casualty Co. of Tennessee v. Street, 213 Ala. 588, 105 So. 672, 674, Mr. Justice Somerville for this court declared: "It was evidently contemplated that applications for revival of lapsed policies should be made to the company through the medium of its local agents, and an application to the agent is in legal effect an application to the company. Hence the authorities have soundly held that undue delay in acting upon the application, or failure to communicate to the insured the fact of the rejection of his application, may amount to a waiver of formal requirements, and operate as an effective revival."

The charge being there considered was:

" 'If you are reasonably satisfied by the evidence that the plaintiff tendered the defendant all that it was due under the policy, which is made the basis of this suit, and such tender was made after such policy was revived, if the same was revived, and defendant refused to accept such tender, then the plaintiff was not under any duty to continue to remake such tender.'

" * * * What facts may constitute a revival of the policy; and what facts show a sufficient tender of premium dues. This criticism is, we think, well-founded. The trial judge should have explained to the jury what facts would constitute a revival of the policy, and also should have explained the requirements for a sufficient tender. The effect of the charge was to leave both questions to the determination of the jury, unaided by definition or explanation. * * *."

See 12 Alabama Digest Insurance, page 391, ☞365 et seq; American Life Ins. Co. v. Renfroe, 232 Ala. 619, 168 So. 871.

In 105 A.L.R. page 486, on the many authorities cited, it is stated: "It is usually held that unreasonable delay by an insurer in approving or rejecting an application for reinstatement of a lapsed policy operates as a waiver of the insured's right to declare a forfeiture of the policy; and where loss occurs after the lapse of a reasonable period of time for the consideration of a reinstatement application, but before formal acceptance or rejection thereof, in legal effect a reinstatement has taken place and the

beneficiary may recover on the policy." Lechler v. Montana Life Ins. Co., 48 N.D. 644, 186 N.W. 271, 23 A.L.R. page 1193; 37 C.J. 500.

It would appear that the better view of the authorities supports the correctness of the charge of the trial court, which, on original hearing, was held to be error without injury. That is to say, under this contract of insurance, and the provisions for reinstatement thereof, the evidence supporting the due or timely action of assured thereunder, and the payment of and receipt therefor by the company of all premiums due to that date of application, the questions of fact presented were for the jury. The court duly and correctly instructed the jury as to the issues involved, as we have indicated, in the excerpt from the court's oral charge set out in original opinion.

It results, therefore, that as the rulings in the original opinion are correct, the application for rehearing is overruled.

Application for rehearing overruled.

ANDERSON, C. J., and BROWN and FOSTER, JJ., concur.